**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**WARRIOR SPORTS, INC.,**
**a Michigan Corporation,**

     **Plaintiff,**

**vs**                       **Case No: 07-14597**
                                **HONORABLE VICTORIA A. ROBERTS**

**STX, L.L.C.,**
**a Maryland Limited Liability Corporation,**

     **Defendant.**
_____/

## OPINION AND ORDER

### I.    INTRODUCTION

Before the Court is Plaintiff's Motion for a Preliminary Injunction.  Oral argument was held at an evidentiary hearing on February 29, 2008.  For the following reasons the Court **GRANTS** the Motion, but in order to determine the appropriate amount of bond, holds it in abeyance pending receipt of Defendant's estimated lost profits.

### II.    BACKGROUND

This controversy arises from a claim of patent infringement based on two of STX, LLC's ("STX") models of protective lacrosse equipment: the "Shogun" and "Chopper." Warrior Sports, Inc. ("Warrior") moves for a preliminary injunction pursuant to FED R. CIV. P. 65(a) and 35 U.S.C. § 283.

Warrior and STX both manufacture and sell lacrosse sports equipment.   Warrior was founded between 1992-1993, and initially struggled to compete against STX and

another established competitor until 1996.  It has since made significant inroads into the market.  This litigation is one of four pending patent infringement suits between the parties.  However, this litigation marks the first litigation over protective gear.

Warrior applied for patent No. 7,103,924 (""924 patent"), and the Patent and Trademark Office ("PTO") initially allowed the patent on September 21, 2004.  The examiner stated:

> Claims 1, 7 and 14 and its respective dependents are allowable because the prior art does not teach or suggest the recitation therein including an upper body garment having chest and back protection portions with a pair of telescopic shoulder protector portions which has an outer shoulder protector being telescopically coupled to the inner shoulder protector, such that each of the pair of shoulder protectors are connected between the chest and back portions.

However, on October 19, 2005, the PTO informed Warrior's counsel that the application was being withdrawn.   At the same time, the examiner suggested Warrior amend its application by adding  the phrase, "said inner shoulder portion being coupled to said chest protector portion and said back protector portion," after the word "position" in claims 1, 7, and 14.  Examiner's Amendment.  The '924 patent was issued to Warrior on September 12, 2006.  Although it alleges additional violations of its '924 patent, Warrior focuses on Claim 1 "for convenience and ease of reference."  Pl.'s Mot. Prelim. Inj. at 6 n.4.

 Claim 1 of the final patent is for:

an upper body protective garment comprising:

> (a) a chest protector portion;
> (b) a back protector portion;
> (c) a pair of telescopic shoulder protector portions in connection between said chest protector portion and said back protector portion;

> (d) wherein each of said pair of telescopic shoulder protector
> portions includes: (e) an inner-shoulder protector portion;
> and (f) an outer-shoulder protector portion that is
> telescopically coupled to said inner-shoulder protector
> portion; and
> (h) said outer-shoulder protector portion being moveable between
> an extended protector and said back protection portion.

According to Warrior, it has incorporated its '924 patent into "most" of its "protective shoulder pads products on the market today." *Id.* at 6. Warrior alleges infringement through STX's manufacture and sale of two models of protective lacrosse shoulder pads: the "Shogun" and "Chopper."

The issues presented are whether: (1) STX infringes; (2) STX raises a substantial question regarding validity or enforceability that strips Warrior of a presumption of irreparable harm; (3) STX can nonetheless rebut the presumption; (4) Warrior can demonstrate irreparable harm without the presumption; and (5) the four relevant factors for a preliminary injunction weigh towards Warrior or STX.

## III.     STANDARD OF REVIEW

When deciding motions for  preliminary injunction, a district court must consider: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Summit County Democratic Cent. & Executive Co. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). No single factor is dispositive. *Connection*, 154 F.3d at 288. The court must balance each factor to determine whether they weigh in favor of an injunction. *Id.*

3

## IV.    ANALYSIS

### A.    Likelihood of Success on the Merits

To demonstrate a strong likelihood of prevailing on the merits Warrior must show that in light of the presumptions and burdens that will inhere at trial: (1) the defendant likely infringes the patent; and (2) its infringement claim will likely withstand a challenge to validity and enforceability. *Amazon.com, Inc. v. BarnesandNoble.com, Inc. and BarnesandNoble.com, LLC*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### 1.    Infringement

There are two steps to the infringement analysis:

(1) the court must determine the scope of the claim; and
(2) the properly construed claim must be compared to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent.

*Amazon.com*, 239 F.3d at 1351.

Step one, determination of the scope of the claim, is a question of law for the Court. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). Step two, comparison of the construed claim to the accused device, is a question of fact. *Id.*

To ascertain the meaning of claims, courts rely on:

(1)  claims;
(2)  the specification; and
(3)  the prosecution history.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "Generally, there is a 'heavy presumption' in favor of the ordinary

meaning of claim language as understood by one of ordinary skill in the art." *Bell Atlantic Network Serv., Inc. v. Covad Commc'n Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *see also Markman,* 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part.  The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention.  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.") (internal citations omitted); *Graham v. John Deere Co. of Kan. City,* 383 U.S. 1, 33 (1966) ("[C]laims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.").  This type of evidence is considered intrinsic.

Additionally, the court may receive extrinsic evidence.  *Markman,* 52 F.3d at 980. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.*

Although extrinsic evidence can be helpful:

> Intrinsic evidence, that is the claims, written description, and the prosecution history of the patent, is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony.  Although it is unacceptable to import limitations into a claim from the written description, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"

*Chamberlain Group, Inc. v. Lear Corp.*, No. 2007-1314-1467, 2008 U.S. App. LEXIS 3448 (Fed. Cir. Feb 19, 2008) (internal citations omitted) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318-1319 (Fed. Cir. 2005) (en banc)).

A claim for literal infringement is proven when every limitation in a claim is

present in the accused device exactly or by a substantial equivalent. *Amazon.com*, 239 F.3d at 1351; *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir. 1991). Although STX "directly and vigorously challenges validity and . . . asserts the infringement defense of enforceability," it offers a perfunctory "dispute" to infringement. Def.'s Resp. at 9; Defendant's Surreply at 4 ("In mid-January 2008, while disputing the alleged infringement . . . STX nonetheless modified [its products] . . . ."); Def.'s Resp. at 13 ("Warrior's legal analysis fails a least with respect to validity and enforceability. [W]arrior's infringement argument . . . [is] entitled to very little . . . weight."). Not surprisingly, STX's products infringe because they meet each of the elements of Claim 1 of the '924 patent. Application of STX's own construction of the intrinsic evidence of the '924 patent all but requires a finding that its products infringe.

However, to defeat Warrior's motion, STX modified its products and argues the versions it *now* produces do not infringe the '924 patent. The modification is the addition of a hot glue gun adhesive to impede the natural function of the telescoping inner and outer shoulder pads. STX maintains that now "the modified Chopper and Shogun outer pads can not [sic] move inwardly with respect to the inner pad, such that the inner pad would overlap more of the outer pad." Def.'s Sur. at Ex. 4, Third Emala Decl. ¶ 8. However, this "modification" is clearly temporary, and reverts to the infringing form as the glue bond separates.

The evidentiary hearing further informed the Court's understanding of the ineffectiveness of STX's "modification." During the hearing defense counsel approached the bench to present the modified product to the Court. Counsel briefly gave the exemplar to the Court to examine. The glue holding the shoulders together

promptly broke apart in the Court's hands. This experience, along with the record in evidence, put to rest all speculation about the effectiveness of STX's purported modification. Although STX submitted affidavits attesting to the sturdiness of the modified products when used for several days by professional lacrosse players, the Court's inspection and Warrior's declarations make clear the modification is an ineffective means to avoid infringement. The Court also notes STX could have made a more durable modification by weaving the pads together or severing the central strap that enables telescopic movement. It chose to do neither.

Even if the glue used to modify the products was more effective, STX's products nonetheless infringe the '924 patent. *High Tech Med. Instrumentation. Inc. v. New Image Indus., Inc.* 49 F.3d 1551 (Fed. Cir. 1995), holds:

> The *fact that it is possible to alter [a product] . . . is not enough, by itself*, to justify a finding that [its] manufacture and sale . . . infringe[s] patent rights. [But], if a device *is designed to be altered* or assembled before operation, the manufacturer may be held liable for infringement if the device, as altered or assembled, infringes a valid patent.

*High Tech*, 49 F.3d at 1556 (emphasis added).

In *High Tech*, the removal of screws from the product allowed infringing use. *High Tech* relied on the fact that although infringing use occurred after removal of the screws: (1) the product was not designed to infringe; (2) there was no reference to the infringing use in the product's promotional materials; and (3) alteration of the product by removing the screws would not serve any functional purpose not already accomplished by other means. *Id.* at 1556. *High Tech's* reasoning supports continuing infringement. All three of the distinguishing points absent from *High Tech* are present in STX's modified products. S*ee also Hansen v. Siebring*, 231 F. Supp. 634, 644 (N.D. Iowa

1964) *aff'd*, 346 F.2d 474 (8th Cir. 1965); *Huck Mfg. Co. v. Textron, Inc.*, No. 35956, 1975 U.S. Dist. LEXIS 12539, at *76-77 (E.D. Mich. May 2, 1975).

The Court holds the modified products also infringe the '924 patent.

## 2. Validity

STX focuses its attack on the validity and enforceability of the patent. At trial STX bears the ultimate burden to prove by clear and convincing evidence that the patent is invalid. *Purdue Pharma v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). STX must "raise[] a substantial question concerning . . . validity [and/or enforceability], *i.e.*, assert[] an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit.'" *Amazon.com*, 239 F.3d at 1350-1351, 1358; *Erico Int'l Corp. v. Vutec Corp.,* No. 2007-1168, 2008 U.S. App. LEXIS 3439, at *6-10 (Fed. Cir. Feb. 19, 2008). "[A] showing of a substantial question . . . requires less proof than the clear and convincing standard to show actual invalidity." *Erico,* 2008 U.S. App. LEXIS 3439, at *10-11. "Validity challenges during preliminary injunction proceedings can be successful . . . on evidence that would not suffice to support a judgment of invalidity at trial." *Amazon.com*, 239 F.3d at 1358.

STX argues that the existence of prior art invalidates Warrior's patent. There are two ways prior art can invalidate a patent: anticipation and obviousness. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576-1577 (Fed. Cir. 1991).

i)      Anticipation

"Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference" or by a substantial equivalent.

*Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) (citation omitted); *Amazon.com*, 239 F.3d at 1351. The first step of an invalidity analysis based on anticipation and/or obviousness in view of prior art is the same as an infringement analysis. *Amazon.com*, 239 F.3d at 1351; *Markman*, 52 F.3d at 996 n.7 (Mayer, J., concurring); *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992). STX argues Warrior's '924 patent is anticipated by STX's EXO shoulder pad ("EXO pad"). STX argues its EXO pad, first released in 2001, contains each of the elements claimed within the '924 patent. STX also argues patent No. 4,295227 ("'227 patent") anticipates the '924 patent.

The claim language is detailed above. In addition, Warrior's '924 patent specification describes the "pair of telescopic shoulder protector portions" as:

> moveable between an extended position and a fully retracted position in connection with the movement of the wearer's arm. When a wearer begins to raise his arm, the telescopic shoulder portion begins to retract. In other words, the outer-shoulder protector portion moves inwardly with respect to the inner-shoulder protector portion such that the inner-shoulder protector portion overlies a majority if not all, of the outer-shoulder protector portion. This *lobster-like coupling* of the inner-shoulder protector portion and the outer shoulder protector portion provides significantly increased flexibility for a wearer without sacrificing protection. This is *similar to the shells on a lobster's tail maneuver.* It will be understood that the outer-shoulder protective portion can be configured to overlie the inner-shoulder protector portion as the telescoping shoulder portion is moved to a retracted position. As the wearer brings his arm down, the strap pulls the outer-shoulder protector portion out from underneath the inner-shoulder protector portion and returns the telescopic shoulder portion to the extended position.

Def.'s Resp., Ex. 1, Patent '924 col. 6 ll. 48-67 (emphasis added).

Lastly, the prosecution history of the '924 includes: (1) approval; (2) withdrawal under 37 C.F.R. § 1.313(b)(3) for "unpatentability of one or more claims;" (3) contemporaneous recommended modifications; and (4) approval with this modification.

However, the citation to prior art does not readily indicate the reasons for the required modifications, or whether the reason specifically related to the critical elements of Claim 1. Although it has import as discussed below, it does not assist the Court's construction of the meaning of the elements of the claim in order to determine its scope.

Given the ambiguous nature of the prosecution history, the Court first examines the claim and specification. *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1336 (Fed. Cir. 2006).

According to STX, the EXO shoulder pad contains:

(1) a pair of telescopic shoulder protector portions in connection between the chest protector portion and the back protector portion.
(2) The inner-shoulder protector portion are coupled to the chest protector portion and the back protector portion by straps and stitching.
(3) The outer-shoulder protector portions are telescopically coupled to the inner-shoulder protector portions by straps that enable the outer-shoulder protector portions to extend and retract . . . .

Def.'s Resp. at 11 (quoting Gotts Declaration ¶ 33).

Warrior says STX ignores that Warrior's '924 patent consists of the "telescopic coupling and movement of the outer-shoulder protector member with respect to the inner-shoulder protector member" (notably the claim actually says portion instead of member). Pl.'s Reply at 2. Warrior points to the fact that the EXO "shoulder pads include only a one-piece shoulder protection portion," which is contrary to the "two-piece telescopically coupled shoulder protection portion" of Warrior's '924 patent. *Id.* at 2. Warrior also says the EXO pad differs because it "is hinged or layered with respect to the garment, and moves in an upward swing, as opposed to the 'telescopic' movement utilized in the '924 patent." *Id.* at 3.

Warrior also vigorously contests the representations of STX's expert, Lawrence

J. Gotts ("Gotts"). Warrior first notes that Gotts, STX's patent attorney in other matters, did not examine a physical sample of the EXO pads to make his initial declaration. Secondly, Warrior argues the omission of the word "telescopic" to describe the movement of the EXO pads by all STX's other declarants except Gotts, belies its contention that its EXO pads anticipated Warrior's '924 patent. Warrior also argues Gotts is essentially acting as co-counsel, and that as a former PTO reviewer he is not one of ordinary skill in the art. Lastly, Warrior presents its own expert to rebut Gotts.

The Court finds the interplay of the outer and inner shoulder protector pad portions in Warrior's patent are distinct from the EXO pad. The '924 patent allows the arm to extend by allowing the outer-shoulder protector portion to slide within the inner-shoulder protector without swinging upward. In the EXO pad, the outer-shoulder protector portion extends outward by swinging on a hinge instead of sliding.

The claim and specification fail to explicitly define "telescopically coupled." Both parties agree on the definitions of "coupled" and generally agree on the intrinsic evidence related to the term "telescopically coupled." Nevertheless, they differ on the ultimate meaning of "telescopically coupled." Grauer Dec. ¶ 11. Thus, the only point of contention is the additional construction of the term by way of extrinsic evidence.

Warrior's expert, Richard Grauer, argues that while Gotts relies on dictionary definitions to give meaning to the term "coupled," he fails to do so for the term "telescopic." Relying on the same web citation of the American Heritage Dictionary of the English Language cited by Gotts, Grauer defines "telescopically" as "extensible or compressible by or as if sliding of overlapping sections." Pl.'s Reply, Ex. C, Grauer Decl. ¶ 11. Grauer then describes the telescopic coupling of the '924 patent as: "the

11

outer portion . . . is guided within the overlapping inner portion . . . as it telescopically slides between its retracted position . . . and its extended position" and "[the outer portion] is guided by, and constrained to telescopically slide within, the [inner portion] by the three belt-like fasteners . . . . " *Id.* ¶ 12. Warrior's expert, although like Gotts, not one of ordinary skill in the art, concludes: "[t]his guided, sliding relative movement of the two overlapping shoulder portions is an important feature of the claimed invention." *Id.*

A shortcoming of Warrior's construction is that nowhere in the claim or specification is the word "slide" used to describe the action of the telescopic coupling. Similarly, the language he uses to describe the telescopic function is not in the claim or specification. However, it is fair to assume the sliding function is assumed in the use of the term "telescopic" within the claim and specification, as understood by one of ordinary skill in the art.

The EXO pad's hinged coupling and movement is also "not lobster-like" or "similar to the shells on a lobster's tail maneuver." Def.'s Resp., Ex. 1, Patent 924 col. 6 line 55-60. Pointedly, the 2001 catalogue manual submitted by STX contains a description of the EXO SP model that says it is "hinged," as opposed to telescopic. Def.'s Resp., Ex. B, STX Equipment Catalogue Excerpts, 2001, 2002, and 2003 at 2. The Court finds STX's EXO pad does not raise a substantial question of invalidity by anticipation, at least because its movement is "hinged" instead of "telescopic."

The Court also finds that the '227 patent does not anticipate the '924 patent. Warrior's expert states that "contrary to [STX's expert's] description, [the] outer-shoulder protector portions . . . are neither 'telescopically coupled' to inner shoulder protector portions . . . nor are these two portions coupled <u>at all</u> . . . by anything else." Grauer Decl.

¶ 14 (emphasis in original). Instead, patent '227 states: "a cover pad overlies the separate outer ends of the front and back sections and is *hinged* to the inner portion of the arch padding for permitting the cover pad to swing upwardly on upward movement of the arm at the shoulder." Def.'s Resp., Gotts Decl., Ex. 5, Ex. C, '227 Patent (emphasis added). Not only does patent '227 describe "hinged" coupling, it does not include the word "telescopic," or a description of the coupling motion as "lobster-like" or "similar to the shells on a lobster's tail maneuver." Def.'s Resp., Ex. 1, Patent '924 col. 6 ll. 55-60. Although the '227 patent does contain the separate inner-shoulder protector portion missing from the EXO pad (something Warrior's expert did not contest in his declaration), it does not anticipate patent '924 because it is "hinged" instead of "telescopic."

Finally, Warrior's declarant, Dale Kohler, the designer of the EXO, Warrior, and Shogun products (now an employee at a Warrior-related company) maintains he "designed [the Shogun and Chopper] for [STX so] that [they] incorporated the telescopic shoulder pad members" found in the Hitman. Kohler Declaration ¶ 7. However, at his deposition, he conceded that counsel provided him with language to include in his declaration. STX also casts additional doubt on Kohler's neutrality, aside from his current employment by Warrior: he was accused of stealing product design information at the time he left his employment with STX.

    ii)   <u>Obviousness</u>

Quoting Gotts' declaration, STX argues:

[W]ith respect to the EXO shoulder pads and the '227 patent, to the extent that [Warrior] might attempt to argue that the connections between the pairs

of telescopic shoulder protector portions and between the inner-shoulder protector portion and the best and back protector portions might be considered to be in locations slightly different from the '924 patent, it is my opinion that such differences in no way affect the function of the devices, including the telescoping function, and represent matters of design choice readily apparent to and well within the level of skill of one of ordinary skill in the art.

Def.'s Resp. at 12. STX also notes that the initial patent was analyzed under the now discarded *Al-Site* obviousness standard, implying the PTO determination should have less weight than is customary.

STX's argument is perfunctory and without merit. The Court found the '227 patent and the EXO do not utilize anything akin "telescopic" coupling, but are instead hinged. More importantly, STX points to no other products, patents, or techniques that could lead the Court to conclude that the '924 patent was "a combination which only unites old elements with no change in their respective functions . . . .", or "a predictable variation." *Teleflex*, 127 S. Ct. at 1739-1740. Instead, Gotts simply asserts obviousness without supportive reasoning. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Teleflex*, 127 S. Ct. at 1740-1741. STX has not raised a "substantial question" on the '924 patent's validity because of obviousness.

iii) <u>The Court's Finding in Light of the Prosecution History</u>

An important point not effectively pursued by STX is the import of the withdrawal of patent allowance, and the modification of the patent. Given the required modification,

the prosecution history suggests the following may not have been patentable at the time the '924 patent was considered by the PTO:

> 1. An upper body protective garment comprising:
> a chest protector portion;
> a back protector portion; and
> a pair of telescopic shoulder protector portions in connection between said chest protector portion and said back protector portion;
> wherein each of said pair of telescopic shoulder protector portions includes an inner-shoulder protector and an outer-shoulder protector portion that is telescopically coupled to said inner-shoulder protector portion, said outer-shoulder protector portion being movable between an extended position and a retracted position

In Claim 1, the patent office required the addition of the following after "position" to issue the patent: "said inner shoulder protector portion being coupled to said chest protector portion and said back protector portion." It also required the insertion of the same language into claims 7 and 14.

Thus, the prosecution history arguably suggests the telescopic function of the '924 patent is anticipated by some other prior art discovered by the patent examiner. However, it does not appear from the record that prior art considered by the PTO contained telescopic coupling.

The Court questioned both parties on this at the hearing. Warrior maintained it simply cannot explain why the addition was required because the prosecution history is ambiguous and/or contradictory. In addition, it points out the Gregory patent, cited by the examiner in the notice of references cited with the examiner's amendment, is not more relevant than the previously considered references because it does not teach telescopic coupling. It also notes it was clear the examiner understood the term telescopic because of the citation to the Dorfman patent.

15

STX does not rebut these points.  Instead, STX's response is that the prosecution history effectively speaks for itself (albeit unclearly), and simply requires the conclusion that the '924 patent's telescopic coupling element in Claim 1 was unpatentable.

The Court holds that while this prosecution history raises a question about the validity of the '924 patent, it does not raise "a substantial question" for several reasons. First, Warrior's explanation of the reasons why the prior art cited in the '924 patent do not support the implication that the telescopic coupling was anticipated or obvious are convincing.  Second, when pressed, STX did not thresh out the reasons the Court should accept this implication without the PTO's citation to relevant prior art supporting this finding, nor did it advance the point in any detail in its briefs to the Court.  Third, even Gotts, upon whose declarations STX at times relied at the evidentiary hearing, had only the following to say about the required amendment: "[it] *suggests* that the examiner considered the combination of the added limitation with other (non-specified) limitations of the claim to be the features relied upon for patentability."  Gotts Decl. ¶ 11 (emphasis added).  A suggestion raises a question, but not a "substantial question."   Fourth, the PTO required the amendment of Claims 1, 7, and 14 because of the "unpatentability of one or more claims."  Thus,  it is not clear that *Claim 1* was the reason for the amendment, or for that matter "unpatentable" as initially described.  Fifth, Warrior does not appear to be estopped by the prosecution history from construing its claim in the manner it has.  *See Graham,* 383 U.S. 1, 33 (1966).  The telescopic coupling was not eliminated from the patent by the modification.  Lastly, as noted by Gotts, "while prosecution history may provide evidence of how the USPTO and the inventor

16

understood the patent, it often lacks the clarity of the specification and thus is less useful for claim construction."  Gotts Decl. ¶ (quoting *Markman*, 52 F.3d at 980).

### 3.    Enforceability

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution."  *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).  The defense "requires proof of materiality and intent by clear and convincing evidence."  *Agfa Corp. v. Creo Prods.*, 451 F.3d 1366, 1377 (Fed. Cir. 2006).  "Upon finding evidence that satisfies a threshold measure of materiality and intent, the trial court then weighs that evidence to determine that the equities warrant a conclusion of inequitable conduct.*"  Id.*  To defeat Warrior's motion, STX must raise a "substantial question as to the enforceability" of the patent.  *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1380 (Fed. Cir. 2006)*; Erico*, 2008 U.S. App. LEXIS 3439, at *6.

Under the applicable reasonable examiner standard, material prior art need not necessarily present a prima facie case of unpatentability."  *Agfa Corp*, 451 F.3d at 1373. "Materiality is not limited to prior art but instead embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."  *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001).

In addition, a "trial court may infer deceptive intent based on a showing that a patentee withheld references with which it was intimately familiar and which were

inconsistent with its own patentability arguments to the PTO." *Agfa*, 451 F.3d at 1378.

"[A] patentee facing a high level of materiality and clear proof that it knew or should

have known of that materiality, can expect to find it difficult to establish subject good

faith sufficient to prevent the drawing of an inference of intent to mislead." *GFI*, 265

F.3d at 1275 (internal quotations and citation omitted).

Warrior did not submit any prior art with its application. STX responded with

exhibits showing the STX's EXO pads were sold and advertised beginning in 2001.

When considering Warrior's '924 patent application the PTO did not review the EXO

pad or the '227 patent.

An omission, alone, does not establish inequitable conduct. Rather, the omission

must be: (1) material; and (2) intentional. If a threshold measure of both is reached the

evidence must weigh such that the equities warrant a conclusion of inequitable conduct.

*Agfa*, 451 F.3d 1366, 1377. Even if these omissions were material**,** "materiality does

not presume intent, which is a separate and essential component of inequitable

conduct." *Sanofi-Synthelabo*, 470 F.3d at 1381 (quoting *GFI*, 265 F.3d at 1274). In

addition, "a patentee need not cite an otherwise material reference to the PTO if that

reference is merely cumulative or is less material than other references already before

the examiner." *GFI*, 265 F.3d at 1274. The more material the omission or the

misrepresentation, the lower the level of intent required to establish inequitable conduct,

and vice versa. *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471 (Fed.

Cir. 1986). "No single factor or combination of factors can be said always to require an

inference of intent to mislead." *GFI,* 265 F.3d at 1275.

Warrior conceded that one of the patent applicants examined STX's product

18

catalogues, and that it is possible he saw the EXO pads.  However, this is not strong

enough to evidence intimate familiarity with the EXO pad, and this prior art was not

"inconsistent with [Warrior's] patentability arguments to the PTO" for the reasons

discussed above.  *Agfa*, 451 F.3d at 1378.  This point alone suggests STX cannot prove

intent.  In any event, Warrior's expert is correct that the '227 patent is cumulative to the

Jurga patent, and that the EXO pads are cumulative to the Wolfe patent, both

considered by the PTO.  Grauer Declaration ¶¶ 9-10.  STX does not respond to these

arguments; Warrior's characterization stands unrebutted.  Because Warrior's applicant

conceded only that he may have seen the EXO pad, the product differed significantly

from the '924 patent, and Warrior submitted unrebutted arguments that it was

cumulative prior art, STX fails to raise a "substantial question" of enforceability.

Based on all of the foregoing, the Court finds that Warrior has met its burden to

show a strong likelihood of success on the merits with respect to infringement or any

invalidity or unenforceability defenses asserted by STX.

**B.      Irreparable Harm**

Irreparable harm is presumed for a preliminary injunction when a clear showing

of infringement, validity, and enforceability have been made.  *Abbott*, 452 F.3d at 1347;

*Amazon* 239 F.3d at 1350; *Christiana Indus. v. Empire Elecs., Inc.*, 443 F. Supp. 2d

870, 882 (E.D. Mich. 2006) (Roberts, J.)*; but see MGM Studios, Inc. v. Grokster, Ltd.*,

518 F. Supp. 2d 1197, 1212 (C.D. Cal. 2007); *see also Nat'l League of Junior Cotillions,*

*Inc. v. Porter*, No. 01-8541, 2007 U.S. Dist. LEXIS 58117, at *9 n.14 (W.D.N.C. Aug. 9,

2007) (listing conflicting authorities).  However, the presumption does not necessarily or

automatically override the evidence of record; it is rebuttable. *Reebok Int'l v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994). "Like many other factual presumptions, it simply acts here as a procedural device which shifts the ultimate burden of production on the question of irreparable harm onto the alleged infringer." *Id.*

In addition to this presumption, Warrior offers the following in support of irreparable harm and/or the inability to calculate monetary damages: (1) the inability to compensate for lost market share and customer loyalty because of the unique aspects of the lacrosse equipment market; (2) the injury of missing the fall ordering season when most of the stock orders for the spring are made; (3) the possible bankruptcy of STX as a result of parallel patent litigation; and (4) justifications for its delay. In response, STX argues: (1) the mootness of Warrior's ordering season argument; (2) the weakness of Warrior's positions in the parallel patent litigation; and (3) Warrior's delay.

In determining irreparable harm, the Court must consider delay by the patent holder in seeking injunctive relief. It is, however, "but one factor to be considered by a district court in its analysis of irreparable harm . . . ." *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991).

STX points out several instances of delay on the part of Warrior. Warrior failed to send notice to STX that it believed its manufacture and sale of the Shogun and Chopper shoulder pad models infringed the '924 patent. Warrior also waited approximately thirteen months from the assignment of patent '924 before filing its motion for a preliminary injunction. Warrior delayed requesting expedited consideration from October 26, 2007 until December 17, 2007, a month and a half after its initial complaint

and motion, and after the fall selling period it argues is critical to a finding of irreparable harm. Finally, Warrior's proffered reason it chose not to file a motion for a preliminary injunction immediately after the patent issued in September of 2006 was because "until August or September, there are no sales in lacrosse industry." Hearing Transcript at 33. However, Warrior waited until long past these critical months to file this motion in 2007. Recently, Warrior counsel also agreed to reschedule the evidentiary hearing for a later date.

Pointing to "a continuum of patent litigations requiring [it] to prevent [STX] from infringing on [it's] valid patent rights," Warrior represents it waited to bring this action as part of "a systematic approach to ceasing [STX's] notorious behavior." Pl.'s Mot. Prelim. Inj. at 13. Warrior also argues it did not need to notify STX of its infringement because STX had actual notice of the patent because STX is consistently reviewing new lacrosse patents.

The Court is unpersuaded by Warrior's justifications for its delay, and finds the presumption of irreparable harm in its favor is rebutted. The Court is also unpersuaded by Warrior's arguments that the pending patent litigation puts STX's very survival in jeopardy, or that it will suffer irreparable harm simply because of the now long past fall ordering season.

Nonetheless, after the rebuttal of Warrior's presumption, the Court finds Warrior may suffer irreparable harm because of loss of customer loyalty and market share. The ineffectiveness of money damages to compensate a party for market loss can constitute irreparable harm. *Canon, Inc. v. GCC Int'l, Ltd.*, 2008 U.S. App. LEXIS 2429, at *10

(Fed. Cir. 2008); *Nutrition*, 930 F.2d at 871. However, "there is no presumption that money damages will be inadequate in connection with a [patent-related] motion for an injunction . . . . Some evidence and reasoned analysis for that inadequacy should be proffered." *Nutrition*, 930 F.2d at 871-872. Citing the declaration of its Vice-President, Warrior argues money damages cannot fully compensate it for its loss of market share because "purchasers in the lacrosse industry tend to be loyal to a particular companies' equipment once they commit to a purchase." Pl.'s Mot. Prelim. Inj. at 13.

Warrior pressed this point at the hearing. First, lacrosse itself is a newly popular and expanding sport. It is rapidly attracting new lacrosse players whose first exposure to the products may determine their product preferences for the foreseeable future. Second, most or many new lacrosse players are young, meaning that gaining their loyalty at an early age holds an important and difficult to measure value for the entirety of their participation in lacrosse. Third, the lacrosse equipment industry is dominated by only three companies; Warrior is the newest. Fourth, Warrior pointed out that STX is selling the infringing products at a substantially lower price. The continued sale of the infringing product in a manner that results in price erosion, and encourages distrust of Warrior's prices, is not readily translated into money damages. Fifth, it is undisputed that pads using the '924 patent are some of the leading protective equipment models. Lastly, lacrosse players have a high degree of brand loyalty.

These arguments are convincing. It is not clear how the damages for these losses could be calculated and compensated with monetary damages. The value of a potentially lengthy and amorphous impact on customer loyalties and brand recognition,

are not easily measured with money damages.  Moreover, at the hearing Warrior

informed the Court that market share studies are not readily accessible.  Because the

relevant companies are privately held, the only type of information that is "at times"

available " are "statistics . . . given to the manufactures from some of the retailers

[showing which manufacturer] over a given month has been the better seller in a

particular product."  Hr'g Tr. at 32.  This point supports the difficulty of calculating

monetary damages, and also partially explains the lack of additional evidence on these

issues.  *Id.* There has also been no licensing of the '924 patent (of which the Court has

been made aware) that it could use to value its use by competitors.

STX leaves these arguments and representations of the lacrosse sport

completely unanswered.  Thus, this is not an instance, as in *Abbott*, where both parties

argue the merits of their irreparable harm argument, but both fail to do so convincingly.

*See Abbott*, 452 F.3d at 1348.  Warrior makes a convincing, unrebutted argument.  The

Court finds that Warrior has met its burden to show it will suffer irreparable harm during

the course of this litigation if the preliminary injunction is denied.

**C.      Substantial Harm to Others**

"The district court must balance the harm that will occur to the moving party from

the denial of the preliminary injunction with the harm that the non-moving party will incur

if the injunction is granted."  *Hybritech*, 849 F.2d at 1457.  If the court grants the motion,

STX will be harmed by lost profits, loss of market share, and customer loyalty.  If it

denies the motion, Warrior will also be harmed.  The STX has non-infringing models of

protective equipment to sell.  This factor weighs in favor of neither party.

## D.     Public Interest

Whether or not the injunction issues the telescopic lacrosse equipment will be provided to the public by at least one of the parties.  "[A]bsent any other relevant concerns, [the Federal Circuit found] that the public is best served by enforcing patents that are likely valid and infringed."  *Abbott*, 452 F.3d at 1348.  Notwithstanding the public's interest in the protection of the rights of valid patent holders, there does not appear to be a critical public interest that would be harmed by issuance of an injunction. This factor weighs slightly in favor of Warrior.

## V.     CONCLUSION

The Court **GRANTS** Warrior's Motion for a Preliminary Injunction, but holds it in abeyance until the proper amount of bond can be determined.  Warrior must pay a bond "in an amount that the court [determines] proper to pay the costs and damages sustained [if STX is] found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c). This amount will include the value of STX's lost sales between issuance of the injunction and the approximate time STX can reach the Federal Circuit on appeal.  Although STX will inevitably lose a market share during this time, the Court has already affirmed the inability to accurately compensate this injury with monetary damages within the specific context of the young and growing lacrosse industry.  It will not attempt to calculate, nor ask STX to calculate, a value that it cannot accurately estimate.  In addition, this would

give STX an opportunity to re-litigate the issue after already having had the opportunity to do so.

Pointedly, STX did not submit information or offer any argument upon which the Court could attempt to calculate the value of any lost profits. Although this Court has wide discretion to determine the amount or need for bond, it must make this determination before granting the injunction. *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158-159 (2d Cir. 2004). The Court orders STX to submit an estimate of lost profits by March 24, 2008. Warrior may also submit a counter-estimate by the same date.

**IT IS ORDERED**.

    /s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: March 19, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 19, 2008.

s/Linda Vertriest
Deputy Clerk